**CASE # CV 07-6022-WHA**

**Response to United Van Lines, LLC V Phyllis Besch**

FILED
JAN 28 PM 1:22
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

I have read the Complaint lodged against me by United Van Lines, and researched the laws, codes, and cases referenced in the document. It appears that the Carmack Amendment, in particular, has given interstate transportation carriers excessive power enabling them to operate without any regard to how goods arrive or customer service but instead to rely on arrogance and intimidation. My case, like so many others, is more complex than the Summons represents and includes items that were moved originally from California and stored in Vermont, a total of three transactions spanning 2.5 years. In my dealings with United Van Lines over that period, once I signed the contract, I have not experienced one shred of professionalism, was not informed of changes that affected my moves, and was exposed to significant attitude from their drivers and packers.

The fact that United Van Line's Colchester, Vermont office apparently lost my credit card number and did not charge the card as we had planned, is only one of many unprofessional actions. When I received my estimate for the move, I specified payment by MasterCard with Francis Russell, the Graham Moving & Storage Company President in Colchester, so I expected that the move was paid. By the time United Van Lines realized that they did not have my MasterCard number, I had received the shipment and had time to unpack the items and assess the damage.

Being a realist, I expect a few nicks and dings in a move. I have moved many times and stored my furniture on two or three occasions. However, I was not prepared for the extensive damage to the furniture in the move back to San Francisco. And this is where the case becomes complex; part of the furniture being moved from Vermont was in storage for about 2.5 years. I had not seen or inspected this furniture from the time it was picked up at my San Mateo, California home on April 6, 2004 until the time it was reloaded and moved back to San Francisco. It arrived here on November 4, 2006. One of the biggest issues is that the items from storage arrived smelling musty and moldy. This included my living room tuxedo style couch, three upholstered chairs, a large handmade Oriental rug, down pillows, etc. As someone who takes allergy medication and is allergic to a number of mold varieties and dust mites, this was not just about the living room smelling so badly that I did not want to enter it; it was a health issue.

The smell of the boxes plus all the furniture was overwhelming, so I contacted professionals to determine the best way to remedy the situation. Meanwhile, I unpacked the boxes as quickly as possible and disposed of the cardboard and packing. However, the upholstered items were a more complex issue. I hired an interior decorator to find resources to clean the items, but the only item anyone would clean was the Oriental rug. On the furniture, they advised me that to completely get rid of the musty smell and mold would require stripping it down to its basic frame and reupholstering it with all new padding material. With that, I hired an environmental specialist who did a limited inspection to ensure that none of the mold exhibited on the furniture was toxic. That enabled me to donate the couch and two chairs to Goodwill, as the cost to reupholster them along with the time to pick out materials, etc. made buying new ones a better option. I have cost estimates from two reputable San Francisco upholstery

firms to prove my case. The third chair, which had sentimental value, I decided to keep and completely reupholster as advised. Down pillows and other smaller items, I just had to throw away.

When I received a call from Francis Russell, the Vermont Agent for United, about two months after the furniture was delivered, he told me that I needed to pay the bill. At that time, I told him I thought we were even, as the cost of replacing and repairing the furniture would be much more than the cost of the $5,235 bill. I also brought up the fact that the furniture that had been in storage smelled moldy. He was very defensive about his storage facility, saying he had never had an issue with it. Perhaps it got wet during one of the many moves from the trucks to the warehouse. The only fact that I know is that my living room furniture was in very good condition, and it had received the inspection of real estate agents and numerous prospective buyers of my San Mateo home that received multiple offers. The furniture is shown on the Agent's brochure, and I have copies of that. When the furniture left the San Mateo house, the movers wrapped it in protective cellophane; when I accepted it in San Francisco, it had no protective covering.

**San Mateo, California Inventory and Loading**
Why, some might ask, did I not pay the bill and submit a claim with United's insurer. I had bought insurance up to $25,000 on the load. That certainly would seem to be a logical choice. However, in this case, the lack of professionalism, indeed the outright lying of United Van Lines employees, made that option difficult. My version of this disastrous move began with the inventory and loading at my San Mateo house on April 6, 2004. United's Menlo Park agency experienced internal issues, and the result was that all the promises for the move evaporated. No communication, no apologies, just belligerence. While I tried to finish the last minute packing, the movers went through and marked all the furniture and its condition. They are supposed to go over that Descriptive Inventory with each client, but they just wanted me to sign the sheet. When I scanned it quickly before signing, I realized that they had marked every item as dented, dirty, etc., including a brand new queen mattress and box spring set that I had received on a warranty issue. The furniture store told me to keep the replacement mattress set in its original plastic protectors and then put it into mattress cartons to maintain the warranty. When I spotted this, clearly a black and white case, I asked the movers to correct and initial that the items were new. I later wrote to Rick Hosea, General Manager of the Menlo Park office, and asked him to write me a letter indicating that the mattress was new and in its protective packaging to protect my warranty on this expensive mattress set. It does not take a leap of faith to see that if they marked a new mattress and box spring as used and soiled, how they marked and depicted the rest of the furniture.

Further complicating the move, each pickup and delivery with the exception of the final delivery in San Francisco, was by local truck, so that involved more moving of furniture in and out of warehouses and onto the appropriate vehicle. Obviously that creates more opportunities for damage and exposure to the elements.

**San Francisco Finale**
While the move from San Mateo was stressful and a very negative experience, the final straw was the move into San Francisco. Again, no communication from the agent; I had to call Philip Christie, the truck driver, to find out when he was supposed to arrive. His truck had broken down somewhere in the

Midwest, and he was delivering at a much later date than scheduled. He finally called on Saturday, November 4, 2006 and wanted to deliver late in the afternoon. He arrived about 3:30 pm, and said I was his fourth delivery that day. He immediately started hurling expletives when he saw that there were outside stairs to climb before reaching my two-story apartment. Like many Victorian houses, the garages are at street level, and the houses are built on top of them. To access the door, one has to climb a series of steps. He and his helper, both I would guess in their 50's, were tired, and the helper had a bad leg. Consequently, Philip left him in the van and chose to bring things in by himself; he carried delicate furniture, planters, and other items banging up the series of concrete steps on a hand truck without any padding.

Because the delivery was so late in the day, it was difficult to see the condition of the furniture, as my lamps were in the shipment. In addition, I had many book boxes and cartons, so things were stacked on top of each other. However, even in the dim light I could see one of the most damaged pieces, an antique marble top commode that is a family heirloom. Philip cursed that the individual inventorying the furniture marked it as an antique. It is impossible to know where all this damage was inflicted, but 90% of the wood items had damage. I had refinished many of the antique pieces myself, so I knew their condition intimately. Two custom pieces I had commissioned in Vermont, made of solid cherry and mahogany, were both damaged, and a decorative piece in ebony was completely knocked off one table.

While two healthy movers could deliver this load in about 3 hours, it took these two movers 7 hours, with most of that time spent smoking in the middle of the street and cursing. They did not leave until 10:30 pm. The driver showed a lot of attitude throughout the entire time and admitted it before he left. He wanted me to forget all about his attitude and write a glowing review of the move in the Customer Survey Form he left with me. He was especially agitated that we could not account for some items, and at 10 pm wanted to go through all the items again. I refused. Since some items were missing tags, it would take me completely unpacking everything to figure out what was missing and what was just missing a tag. However, I did realize before they left that some things were missing, and I went out to the truck and found a large toolbox and part of my portfolio for my business. They also tried to bring in items that were not mine. Clearly, items were not separated by shipment on the truck.

To make this as brief as possible, I have highlighted only the most damaged items. This Response does not include all the damaged or missing items, and there are many. I have documented all these items and can present the list to the Court.

Once the movers left, I thought I was through with United Van Lines. My attention turned to trying to figure out what to do with a house full of furniture that was either physically scarred or smelled musty due to mold and mildew damage. That task took me time, has cost approximately $10,000, and is not complete. It took high-powered air filtering devices with HEPA filters running 24 hours a day to make my downstairs air breathable once again.

**Conclusion**

To date, I have paid United Van Lines a total of $5483 for the move to Vermont and storage. The only item in question is their request for $5235 for the move back to San Francisco. On January 17, 2008, I talked with Eric Morris of Stone Rosenblatt Cha, lawyers for United, and offered a sum to settle. It took me repeated calls to receive an answer, but on January 24, 2008, Eric Morris told me that they would only settle for the full amount. While I do not like conflict in my life and try to avoid it at all costs, I also believe that in any contract both parties have rights. I have documented my side of this case very carefully as I have found factual errors in the legal correspondence from United. At the appropriate time, I am prepared to present all my documentation to the Court.

I ask the Court for consideration of my plea in this case where I have suffered excessive damage to my personal furniture and belongings through the carelessness of United Van Lines and its agents. I further request that the Court judge in my favor considering the damages I experienced greatly exceed the amount United is requesting.

Dated: January 25, 2008

Phyllis S. Besch
2026 California Street
San Francisco, CA 94109
415.563.0708